# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| GLYBURIDE<br><br>THIS DOCUMENT RELATES TO:<br><br>*DIRECT PURCHASER ACTIONS* | HON. CYNTHIA M. RUFE |
| ROCHESTER DRUG CO-OPERATIVE, INC. and FWK HOLDINGS, L.L.C., on behalf of themselves and all others similarly situated,<br><br>                  Plaintiff,<br><br>v.<br><br>AUROBINDO PHARMA USA, INC., CITRON PHARMA, LLC, HERITAGE PHARMACEUTICALS, INC., and TEVA PHARMACEUTICALS USA, INC.,<br><br>                  Defendants. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

## DIRECT PURCHASER CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ......................................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................3

III.    PARTIES ...................................................................................................................4

        A.      Plaintiffs ........................................................................................................4

        B.      Defendants .....................................................................................................4

IV.     INTERSTATE TRADE AND COMMERCE ........................................................5

V.      FACTUAL ALLEGATIONS ...................................................................................6

        A.      The Generic Drug Market Is a Commodities Market, Where Competition
                Historically Has Been Keen. .........................................................................6

                1.      Generic drugs should lead to lower prices. ......................................6

                2.      Prescription drug prices in the United States are governed by
                        institutional safeguards, which are intended to keep drug prices
                        competitive. ......................................................................................9

        B.      Consolidation Has Reduced the Number of Competitors in the Generic
                Pharmaceutical Industry. .............................................................................11

        C.      Factual Background on Glyburide. ..............................................................11

        D.      Defendants' Anticompetitive Activities. .....................................................12

                1.      Specific anticompetitive activities as to glyburide .......................12

                2.      Defendants have ample opportunities to communicate through
                        trade organizations, and have availed themselves of these
                        opportunities to collude. .................................................................17

                3.      Government investigations ..............................................................18

VI.     THE GLYBURIDE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION ...........26

VII.    CLASS ACTION ALLEGATIONS ......................................................................29

VIII.   ANTITRUST INJURY ..........................................................................................31

IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN
ACT ............................................................................................................................... 32

PRAYER FOR RELIEF ........................................................................................................... 33

JURY TRIAL DEMANDED ...................................................................................................... 34

## I.    INTRODUCTION

1.    Plaintiffs Rochester Drug Co-Operative, Inc. and FWK Holdings, L.L.C., on behalf of themselves and all others similarly situated, bring this Class Action Complaint on behalf of a Class (defined below) of direct purchasers who purchased generic glyburide tablets 1.25, 2.5, and 5 mg directly from Defendants Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., or Teva Pharmaceuticals USA, Inc.

2.    This is a civil action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize the prices, rig bids, and allocate customers for glyburide.  As set forth below, Defendants' scheme violates federal and state antitrust laws.

3.    Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 diabetes.

4.    This drug is not new: branded versions of glyburide have been on the market for over 30 years, and generic versions have been available since the mid-1990s.

5.    Beginning on approximately April 1, 2014, and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an overarching anticompetitive scheme in the market for glyburide.  The conspiracy was furthered by discussions held at trade association meetings and events, as alleged in paragraphs 73-77.

6.    Plaintiffs' allegations are based on personal knowledge of these matters relating to itself and upon information and belief as to all other matters.  Part of Plaintiffs' allegations are based on information made public during government investigations of Defendants for alleged unlawful conduct in the generic pharmaceutical industry.

7.    Defendants' pricing behavior has resulted in extensive and ongoing scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department

of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and 40

state Attorneys General, as alleged in paragraphs 78-93.

8.    The DOJ's 2014 investigation followed a congressional hearing and investigation

prompted by the National Community Pharmacists Association's ("NCPA") January 2014

correspondence to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee

and the U.S. House Energy and Commerce Committee requesting hearings on the significant

spike in generic drug pricing.[1]  The NCPA's news release reports price hikes on essential generic

drugs exceeding 1,000% in some instances, according to its survey of over a thousand

community pharmacists, resulting in patients being forced to leave their prescriptions at the

pharmacy counter due to increased copays, and forcing more seniors into Medicare's coverage

gap (or "donut hole") where they must pay far higher out-of-pocket costs.

9.    The direct, foreseeable, and intended consequence of Defendants' anticompetitive

scheme was to cause Plaintiffs and Class Members to pay more for glyburide than they otherwise

would have paid in the absence of Defendants' unlawful conduct.  Were it not for Defendants'

collusion to restrain or eliminate competition by engaging in a conspiracy to foreclose

competition in the United States market for glyburide, Plaintiffs and Class Members would not

have paid supracompetitive prices for glyburide.

10.    Plaintiffs seek damages incurred due to Defendants' and co-conspirators'

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

---

[1] News release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), available at http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

## II.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

12.    Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

13.    During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of glyburide in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

14.    This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of glyburide throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to raise and stabilize the prices for glyburide, rig bids for glyburide, and allocate customers and markets for glyburide that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    PARTIES

### A.    Plaintiffs

15.    Plaintiff FWK Holdings, L.L.C. ("FWK") is an Illinois limited liability company located in Glen Ellyn, Illinois.  Plaintiff is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of glyburide during the Class Period directly from one or more of the Defendants at supracompetitive prices.  As a result of Defendants' antitrust conspiracy, FWK/Kerr paid supracompetitive prices for glyburide and was injured by the illegal conduct alleged herein.

16.    Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a stock corporation duly formed and existing under the New York Cooperative Corporations Law, with its principal place of business in Rochester, New York.  During the Class Period, as defined below, RDC purchased glyburide directly from one or more of the Defendants at supracompetitive prices.  As a result of Defendants' antitrust conspiracy, RDC paid supracompetitive prices for glyburide and was injured by the illegal conduct alleged herein.

### B.    Defendants

17.    Defendant Aurobindo Pharma USA, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dayton, New Jersey. Aurobindo has an ongoing partnership with Citron Pharma LLC, whereby Aurobindo manufactures generic glyburide, which Citron Pharma LLC then sells under its trade dress. During the Class Period, Aurobindo conspired with others to fix and raise the prices of glyburide sold in the United States.

18.    Defendant Citron Pharma, LLC is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in East Brunswick, New

Jersey. In December 2016, ACETO Corporation acquired generic products and related assets of Citron for $429 million. During the Class Period, Citron conspired with others to fix and raise the prices of glyburide sold in the United States.

19.    Defendant Heritage Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Eatontown, New Jersey. During the Class Period, Heritage conspired with others to fix and raise the prices of glyburide sold in the United States.

20.    Defendant Teva Pharmaceuticals USA, Inc. is a Pennsylvania-based corporation with its principal place of business in North Wales, Pennsylvania. Teva is a subsidiary of Teva Pharmaceutical Industries Limited, an Israeli company with its principal place of business located in Petach Tikva, Israel. Teva manufactures, markets, and sells various generic pharmaceutical products. During the Class Period, Teva conspired with others to fix and raise the prices of glyburide sold in the United States.

21.    Defendants Aurobindo, Citron, Heritage, and Teva are referred to collectively as "Defendants."

22.    Various other entities and individuals unknown to Plaintiffs at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## IV.    INTERSTATE TRADE AND COMMERCE

23.    Defendants are the leading manufacturers and suppliers of glyburide sold in the United States.

24.    Glyburide is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

- 5 -

25.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold glyburide throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

26.    The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

27.    Defendants' and their co-conspirators' conduct, including the marketing and sale of glyburide, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

28.    The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of glyburide within the United States.

29.    Defendants' agreement to fix, raise, maintain, or artificially stabilize prices and allocate customers for glyburide, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing glyburide prices and customer allocation, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.    FACTUAL ALLEGATIONS

**A.    The Generic Drug Market Is a Commodities Market, Where Competition Historically Has Been Keen.**

**1.    Generic drugs should lead to lower prices.**

30.    Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration ("FDA") requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand. By law, generics must have the same amount of active ingredient and must be "therapeutically

equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product." [2]

31.    To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; it is "abbreviated" because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials itself. Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable for the RLD.

32.    Although equivalent from a safety and efficacy standpoint, generic versions of brand drugs are priced significantly below their brand counterparts, and because of this rapidly gain market share from the brand beginning immediately following launch. Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

33.    It is well established in economic literature that competition by generic products results in lower prices for drug purchasers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price free from competitive market forces. But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy counter substitution, and generics capture as much

---

[2] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/ InformationOnDrugs/ucm079436.htm#G.

as 80% of the market or more within months of launch. And as more generics become available, generic prices only decline further due to competition among generics, and the brand drug's share of the overall market erodes even faster. These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval.[3]

34.    Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and the brand drug itself, and every year new generic drugs result in hundreds of billions of dollars in savings to consumers, insurers, and other drug purchasers.

35.    A Federal Trade Commission ("FTC") study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices." A mature generic market, such as the market for glyburide, has multiple generic competitors. Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[4] Over time, generics' pricing nears the generic manufacturers' marginal costs.

36.    Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found

---

[3] H.R. Rep. No. 98-857, pt. 1, at 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647.

[4] *See, e.g.*, FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[5]

 2.     **Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

37.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay. But because of the unique features of the prescription drug marketplace, prescription drug pricing for most consumers is not determined between the retailer and the consumer. Rather, because most consumers' prescription drug purchases are reimbursed by public or private health plans, the pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payors, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payors' insured customers.

38.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs. WAC prices represent the manufacturer's benchmark or reported list price. The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically do not include discounts that may be provided, *e.g.*, for volume sales.

39.     At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up and/or dispensing fee. Over time, however, it was learned that the list price for most generic drugs published by their

---

[5] *Generic Pharm. Ass'n, Generic Drug Savings in the U.S.* 1 (7th ed. 2015), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs.

40.    To reduce the cost of prescription drugs to the public, prescription drug payors developed Maximum Allowable Cost prices ("MACs") to determine the amount that pharmacies would be reimbursed for dispensing generic pharmaceuticals. The MAC price refers to the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a generic drug or brand drug that has a generic version available. A MAC price thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

41.    Payors set the MAC pricing of a drug based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.

42.    MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available on the market, without regard to the manufacturer's list price. Because the reimbursement amount to a pharmacy is limited by the MAC price for a generic drug and each of its equivalents regardless of the pharmacy's acquisition cost, a pharmacy's profit will be reduced, or lost altogether, if it purchases other than the lowest cost generic product. Alternatively, if a retail pharmacy purchases the lowest priced generic version of the drug, it will maximize its profit.

43.    MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices. Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug will lose sales to a competing generic manufacturer whose price remains constant.

44.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price (or maintain high prices in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.

**B.     Consolidation Has Reduced the Number of Competitors in the Generic Pharmaceutical Industry.**

45.     Since 2005, consolidation has generally reduced the number of competitors in generic pharmaceutical markets.  Consolidation reduces the number of potential competitors, rendering the market ripe for collusion.

46.     Generic pharmaceutical industry leader Teva, for example, acquired Ivax Corporation in 2006, Barr Laboratories in 2008, Ratiopharm—Germany's second largest generic drug producer— in 2010; and Allergan's generics business (including Actavis generics) in 2016. Other major transactions that occurred during the same time period include Watson Pharmaceuticals' acquisition of Andrx Corporation in 2006; Daiichi Sankyo's purchase of a majority stake in Ranbaxy in 2008; Endo's 2010 acquisition of Qualitest; Perrigo's acquisition of Paddock Laboratories, Inc. in 2011; and Sandoz's acquisition of Fougera in 2012.

**C.     Factual Background on Glyburide.**

47.     Glyburide is an anti-diabetic drug of the sulfonylurea class indicated to treat Type 2 diabetes.  Sulfonylureas have been used to control high blood sugar levels in Type 2 diabetes longer than any class of agents except insulins.  Glyburide itself is a white crystalline compound, formulated into tablets.

48.     Glyburide was developed in 1966 as part of a cooperative study between Boehringer Mannheim and Hoechst and has been marketed since the 1980s. Current branded versions of glyburide include: DiaBeta®, which is sold by Sanofi; and Glynase®, which is

sold by Pharmacia and Upjohn (now part of Pfizer).

49.    Generic drug manufacturers that currently manufacture or sell generic versions of non-micronized, non-metformin glyburide include Aurobindo, Citron, Heritage, Teva, CorePharma, LLC (now part of Impax Laboratories, Inc.), TruPharma LLC (in a partnership with PharmaDax Inc.), and Zydus Pharmaceuticals USA Inc.

50.    CorePharma, TruPharma, and Zydus only recently entered the glyburide market: CorePharma received FDA approval for its glyburide product in September 2015; TruPharma's glyburide product received FDA approval in April 2016; and Zydus's glyburide product received FDA approval in May 2016.

51.    Therefore, during the Class Period, the primary competitors in the non-micronized, non-metformin glyburide market were Defendants Aurobindo, Citron, Heritage, and Teva.

**D.    Defendants' Anticompetitive Activities.**

52.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which glyburide would be sold, rig bids for glyburide, and allocate customers and markets for glyburide.  All of this anticompetitive activity had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially supracompetitive prices above prices that would exist if a competitive market had determined prices for glyburide.

**1.    Specific anticompetitive activities as to glyburide**

53.    Defendants entered into a multiyear conspiracy to fix and stabilize the prices of glyburide, rig bids for glyburide, and allocate markets for and customers of glyburide.  Heritage

led the conspiracy, and its executives Malek and Glazer coordinated and monitored Defendants' actions.

54.    On April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage had targeted for price increases, including glyburide.  On the call, Malek discussed the need to coordinate pricing with Heritage's competitors in the markets for these various generic drugs.  At the time of this call, Aurobindo and Teva were Heritage's only competitors in the glyburide market.

55.    After the call, Malek instructed members of the Heritage sales team to reach out to their contacts at Aurobindo and Teva immediately in an attempt to reach agreements on the price increases for glyburide.

56.    Malek was responsible for communicating with Teva, which competed with Heritage in the markets for several generic drugs, including glyburide.  Malek made direct contact with a representative at Teva to discuss price increases for glyburide, among other generic drugs.  Ultimately, Malek and Teva's representative reached an agreement to fix and raise prices on glyburide and other generic drugs.

57.    Defendants Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices.  Malek and Glazer sent several emails to their employees imploring them to reach agreements with their competitors in the generic glyburide market, among others, as soon as possible.  For example, on April 28, 2014, Malek sent an email to one Heritage employee concerning the status of discussions with Aurobindo.

58.    Glazer followed up the next day with an email to that same employee requesting further information, and Malek sent an additional email on April 30 requesting an update.

59.     On May 9, 2014, Heritage held another teleconference with its employees to discuss the contemplated prices increases for glyburide, among other generic drugs.

60.     The following week, one Heritage employee met in-person and discussed price increase strategies with several competitors at the Minnesota Multistate Contracting Alliance for Pharmacy.  During that meeting, that Heritage employee agreed with her counterpart at Aurobindo that they would both raise the prices of their glyburide products.  On May 15, 2014, the same Heritage employee emailed Malek confirming this agreement.

61.     On June 23, 2014, Heritage employees met and discussed the specific percentage amounts they would seek to increase certain generic drugs, including glyburide, and the strategies for doing so.  They reached a consensus that they would attempt to raise glyburide prices by 200%.

62.     Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors to secure agreements to fix and raise prices for glyburide and other generic drugs.

63.     Heritage's competitor outreach extended to incoming entrants in the glyburide market to ensure that these new competitors would not engage in price competition to steal share from the incumbent manufacturers.  For example, on June 25, 2014, one Heritage employee contacted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling glyburide in the near future.  Once it was determined that Citron would be entering the glyburide market (through a manufacturing partnership with Aurobindo), Heritage employees had extensive phone, text message, and in-person conversations with Citron employees concerning Citron's glyburide pricing and bidding strategies.

64.     While these discussions with Citron were ongoing, Malek continued to push Heritage's employees to communicate with Heritage's other competitors—both in the glyburide and other generic drug markets—in order to maintain existing agreements on pricing and bidding as well as reach new ones.

65.     Further communications among competitors were conducted through the auspices of trade association meetings and conferences—including those sponsored by the National Association of Chain Drug Stores ("NADCS"), the Healthcare Distriution Management Association ("HDMA"), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM").  Defendants' representatives participated in golf, dinner, and other social outings sponsored by these organizations.  During these conferences, Defendants and other generic drug manufacturers also discussed current and future business plans, prices, bids, rebates, and customers.  These conferences—as well as their attendant social gatherings—provided Defendants with the means and opportunity to discuss and reaffirm existing agreements to fix and raise prices for glyburide, among other drugs.

66.     Defendants' employees also attended private "industry dinners," outside the trade association context, with employees from competitors.  At these industry dinners, one company was usually responsible for paying for dinner for all of the attendees—with who pays typically determined by alphabetical order.

67.     Female generic pharmaceutical sales representatives also arranged regular "Girls Night Out" ("GNO"), or "Women in the Industry," meetings and dinners. "Women in the Industry" dinners were typically organized by a saleswoman from Heritage who resides in Minnesota.  Other meeting participants were typically, but not exclusively, employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area.  During these

industry dinners, GNOs, and "Women in the Industry" gatherings, Defendants' representatives met with their competitors and discussed competitively sensitive information, including their respective current and future business plans, prices, bids, rebates, customers.

68.    At least one GNO was held in September 2014, and several different GNOs were held in 2015, including one at the ECRM conference in February (involving Citron and Heritage, among others); another in Baltimore in May (involving Citron and Heritage among others); and a third at the NACDS conference in August (involving Citron and Heritage, among others).

69.    Defendants' conspiracy was also aided and abetted by Defendants' efforts to actively conceal their wrongdoing from the public and the government regulators investigating their illegal activities.  Going back to at least 2012, Heritage executives took overt steps to conceal their illegal activity and destroy evidence of their wrongdoing.  Specifically, none of the email accounts maintained by Heritage had any company-imposed document retention policy associated with them.  Indeed, Heritage executives reminded each other to delete emails reflecting incriminating communications.

70.    Notwithstanding the practice of destruction of email evidence—and the lack of an official document retention policy—out of a further abundance of caution, Heritage and other Defendants consciously avoided using emails or other forms of communications that could later be subject to discovery.

71.    For example, shortly after a text message exchange between Citron and Heritage employees, in which the two companies agreed to fix and raise prices for glyburide, one Citron employee told her counterpart at Heritage that Heritage employees should not communicate with Citron through email, but instead should call a designated person at Citron if they had any information to share.

72.     The end result of Defendants' anticompetitive scheme was a significant reduction in a competition, which resulted in higher prices to Plaintiffs and members of the Class than would exist absent the scheme.

### 2.     Defendants have ample opportunities to communicate through trade organizations, and have availed themselves of these opportunities to collude

73.     The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade organizations have been used as forums for collusion between sales personnel among competing generic drug companies.[6]

74.     For example, the GPhA is the "leading trade association for generic drug manufacturers."[7]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

75.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers

---

[6] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[7] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.  While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines.  *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

and regulators, and peer-to-peer connections."[8]  GPhA's "member companies supply

approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

76.    Several of Defendants' high-ranking corporate officers have served on GPhA's

Board of Directors, including Teva's Allen Oberman and Debra Barrett and Heritage's Jeff

Glazer, who has pleaded guilty to federal criminal charges relating to the price fixing and other

anticompetitive activity concerning generic pharmaceuticals including glyburide.

77.    Defendants each attended the following GPhA meetings shortly before and during

the Class Period:

| Meeting | Meeting Date and Location | Attendees |
|---|---|---|
| 2014 GPhA Annual Meeting | February 19-21, 2014, Orlando, Florida | Aurobindo, Heritage, Teva |
| 2014 GPhA Fall Technical Conference | October 27-29, 2014, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |
| 2015 GPhA Annual Meeting | February 9-11, 2015, Miami Beach, Florida | Aurobindo, Heritage, Teva |
| 2015 GPhA CMC Workshop | June 9-10, 2015, Bethesda, Maryland | Citron, Heritage, Teva |
| 2015 GPhA Fall Technical Conference | November 2-4, 2015, Bethesda, Maryland | Aurobindo, Citron, Heritage, Teva |

### 3.    Government investigations

78.    Defendants' conduct in generic drug pricing is under investigation by the federal

government, including the U.S. Senate and DOJ, as well as an investigation by forty state

Attorneys General.

---

[8] Ass'n for Accessible Medicines, *Membership*, *available at*
http://www.gphaonline.org/about/membership.

79.     Following the DOJ opening its criminal investigation into Defendants' conduct on or about November 3, 2014, grand jury subpoenas have been issued to at least 14 generic drug companies.  Recently, generic drug manufacturer Perrigo Company plc disclosed in a press release that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[9]  The press release also noted that, "As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."

80.     On December 21, 2016, ACETO Corporation, a company which recently purchased Citron's generic assets in December 2016, disclosed that the "Antitrust Division of the U.S. Department of Justice executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ."[10] ACETO also disclosed that in September 2016, the Attorney General of the State of Connecticut requested that Citron produce all documents produced to DOJ.

81.     On August 4, 2016, Teva disclosed that "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[11] In that same filing, Teva disclosed that on July 12, 2016, "Teva USA received a subpoena from the

---

[9] Perrigo Website, Press Release, *Perrigo Discloses Investigation* (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[10] Aceto Corp., SEC Form 8-K, Ex. 99.5.

[11] Teva, SEC Form 6-K at 25 (Aug. 4, 2016).

Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[12]

82.     The fact that these companies or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.   Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[13]   The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[14]   "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.   If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[15]   "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[16]   Thus, Defendants' and their representatives' receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

---

[12] *Id.*

[13] U.S. DOJ, Antitrust Division Manual (5th ed. 2015) at III-82.

[14] *Id.*

[15] *Id.* at III-83.

[16] *Id.*

83.    That a target has reportedly applied for leniency is also significant.  As the DOJ

notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-

divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

The DOJ further provides that the leniency applicant must also satisfy the following condition,

among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is

truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

84.    On December 12, 2016, the DOJ filed the first two criminal charges stemming

from this investigation.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-

RBS (E.D. Pa.); *United States of America v. Jason T. Malek,* No. 2:16-cr-00508-RBS (E.D. Pa.).

These cases allege that these former senior executives of generic drug maker Heritage

Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to

fix prices, rig bids and allocate customers for generic glyburide and doxycycline.  On January 9,

2017, both Mr. Glazer and Mr. Malek pleaded guilty to the charges.  Sentencing for both Mr.

Glazer and Mr. Malek was originally set for April 2017 but was later rescheduled to September

2017 as they continue to cooperate with the DOJ.  Evidence reportedly unearthed in a related

case shows that Mr. Malek compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers, and that some of its competitors were willing to reach such agreement.

85.     The DOJ has intervened in numerous civil antitrust actions alleging price fixing, bid rigging, and market allocation of generic pharmaceuticals due to the fact that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Malek and Glazer] informations that were unsealed."[17]  The DOJ has filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[18]  The DOJ also recently filed a motion for a stay of discovery in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, noting that "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a

---

[17] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

[18] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re Generic Digoxin and Doxycyclyine Antitrust Litig.*, MDL 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[19]

86.     The steep climb of generic drug prices of late is an issue of national importance. In addition to the DOJ subpoenas and criminal charges, Congress has taken a keen interest in the matter.  For instance, in October 2014, Senator Bernie Sanders (I-VT) and Representative Elijah E. Cummings (D-MD) launched an investigation into the inexplicably soaring generic drug prices.

87.     Sen. Sanders and Rep. Cummings issued a joint press release at the start of the investigation indicating that they had issued letters to 14 pharmaceutical companies, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  The bicameral duo noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.  The legislators made this issue a priority because, for some of their constituents, "the outrageous price hikes are preventing patients from getting the drugs they need."[20]

88.     The U.S. Senate HELP Committee conducted a hearing on November 20, 2014, "Why Are Some Generic Drugs Skyrocketing in Price?"[21]  The committee heard testimony from one pharmacist, who explained "it was extremely concerning when about a year ago, pharmacies

---

[19] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL 2724, ECF 279 (E.D. Pa. May 1, 2017).

[20] Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[21] Press Release, *Drugmakers Mum on Huge Price Hikes* (Nov. 20, 2014), *available at* http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

began noticing a rash of dramatic price increases for many common, previously low-cost generic

drugs."[22]  Using generic digoxin and doxycycline as examples of two of the generic drugs with

price spikes, the pharmacist explained:

> A recent example from my own experience is the price of Digoxin—
> a drug used to treat heart failure. The price of this medication
> jumped from about $15 for 90 days' supply, to about $120 for 90
> days' supply. That's an increase of 800%. One of my patients had
> to pay for this drug when he was in the Medicare Part D coverage
> gap in 2014. Last year, when in the coverage gap he paid the old
> price. This year he paid the new price. Needless to say, the patient
> was astounded, and thought I was overcharging him. The patient
> called all around to try to get the medicine at the old, lower price,
> but to no avail. This caused him lots of stress and time, and caused
> us lots of stress and time in explaining the situation, reversing, and
> rebilling the claim. This example is typical of how these price spikes
> put consumers and pharmacists in a bad position, often grasping at
> straws for explanations. And all the while, everyone pays more,
> including the patient, the pharmacy, and the insurer (often the
> federal government).[23]

89.     Additional congressional hearings concerning the dramatic rise of generic drug

prices were held in December 2015 and February 2016.  At the U.S. Senate Special Committee

on Aging's December 9, 2015 hearing, the Director of the Drug Information Service of the

University of Utah noted the deleterious effect these drug prices have had on patient access and

healthcare: "[w]hen medication prices increase in an unpredictable and dramatic way, this can

create an access issue for hospitals and patients.  If hospitals cannot afford to stock a product in

the same amount due to price increases, this effectively creates a shortage."

---

[22] *Why are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm.
on Primary Health & Aging* of the S. Comm. on Health, Educ., Labor & Pensions, 113th Cong.
(2014) (testimony of Rob Frankil, Independent Pharmacist & Member of the Nat'l Community
Pharmacists Ass'n), *available at* http://www.help.senate.gov/imo/media/doc/Frankil .pdf.

[23] *Id*.

90.    On February 24, 2015, Senator Sanders and Congressman Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[24]  The OIG responded to the request on April 13, 2015, advising would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[25]

91.    On December 15, 2016, several states' attorneys general, led by the State of Connecticut Office of Attorney General, filed a civil action in the U.S. District Court for the District of Connecticut for violation of the Sherman Act against Heritage Pharmaceuticals, Inc. and other sellers of generic doxycycline hyclate and glyburide.  The action filed by the attorneys general is styled *The State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., Citron Pharms, LLC, Mylan Pharmaceuticals USA, Inc. and Teva Pharmaceuticals USA, Inc., Heritage Pharmaceuticals, Inc. and Mylan Pharmaceuticals, Inc.* ("State AG Action").

92.    According to the State AG Action, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.  Although the State AG Action currently focuses on doxycycline hyclate and glyburide, it alleges that the Plaintiff States have uncovered a wide-

---

[24] Letter from Sen. Bernard Sanders & Rep. Elijah E. Cummings, U.S. Cong., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[25] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Sen. Bernard Sanders (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download /oig-letter-to-sen-sanders-4-13-2015?inline=file.

ranging series of conspiracies implicating numerous different generic pharmaceuticals and competitors.

93.    The DOJ and State AG investigations of Defendants' alleged price-fixing conduct in the generic pharmaceutical industry are ongoing.  The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.  The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[26]

## VI.    THE GLYBURIDE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

94.    The structure and other characteristics of the market for glyburide make it conducive to collusion. Because Defendants' anticompetitive conduct constitutes a conspiracy to fix prices, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs do not need to define a relevant market.   However, there are features of the market relevant to this case that show that the market is susceptible to collusion.

95.    The factors necessary to show that a market is susceptible to collusion are present in this case:

(1)    **High Level of Industry Concentration** – A small number of competitors (Defendants) control a significant market share for glyburide, as detailed above.

(2)    **Sufficient Numbers to Drive Competition** – While the market for glyburide tablets had a small enough number of competitors to foster collusion, the number of makers was large enough that – given decades of experience with competitive generic pricing, and accepted models of how

---

[26] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

generic companies vigorously compete on price – one would have expected prices to remain at their historical, near direct cost levels.  With the number of generic competitors such as there were here, historical fact and accepted economics teaches that – absent collusion – prices would remain at competitive levels.

(3)    **High Barriers to Entry** – The high costs of manufacture, intellectual property, and expenses related to regulatory approval and oversight are among the barriers to entry in the generic drug market.  By insulating against new entrants, these barriers to entry and others increase the market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4)    **High Inelasticity of Demand** – For the hundreds of thousands of glyburide prescriptions written annually, it is a necessity that must be purchased regardless of price hikes.  This makes demand for glyburide highly inelastic. Defendants can significantly raise glyburide prices with minimal effect on quantity thus increasing overall revenue.

(5)    **Lack of Substitutes** – While there are other drugs on the market to lower blood sugar levels for patients with type 2 diabetes, there are significant barriers to change treatments.

(6)    **Commoditized Market** – Defendants' glyburide products are fully interchangeable because they are bioequivalent to one another by FDA standards.  Thus, all manufactured versions of glyburide are therapeutically equivalent to each other and pharmacists may substitute one for another interchangeably.

(7)    **Absence of Departures from the Market** – There were no departures from the market that could explain the price increases or stifled price competition; indeed there were additional market entrants during the relevant period.

(8)    **Absence of Non-Conspiring Competitors** – Defendants have maintained supracompetitive pricing for glyburide tablets throughout the Class Period.  Thus, Defendants have oligopolistic market power in the glyburide market, which enables them to increase prices or refuse to compete without loss of market share to non-conspirators.

(9)    **Opportunities for Contact and Communication Among Competitors** – Defendants participate in the committees

- 27 -

and events of the GPhA, which provides and promotes opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications, further supports the existence of communication lines between competitors with respect to, among other things, generic pricing.

(10) **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit non-collusive parallel price increases. The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions. As a result, the usual inhibition of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

96. Though it is not necessary to allege a relevant market, at all relevant times, Defendants had substantial market power (*i.e.*, monopoly power) with respect to glyburide because they had the power to maintain the price of the drug at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

97. A small but significant, non-transitory price increase above the competitive level for glyburide by Defendants would not have caused a loss of sales sufficient to make the price increase unprofitable.

98. Defendants sold glyburide at prices well in excess of marginal costs, and in excess of competitive prices, and enjoyed high profit margins.

99. Defendants, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to regulatory protections and high costs of entry and expansion.

100. To the extent that Plaintiffs are legally required to prove substantial market power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant

market is glyburide or narrower markets contained therein. During the relevant time, Defendants were able to profitably maintain the price of glyburide tablets substantially above competitive levels.

101.    The relevant geographic market is the United States and its territories.

102.    Through their market dominance, Defendants' have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class Members fixed prices above competitive levels for glyburide tablets through unlawful price collusion.

## VII.    CLASS ACTION ALLEGATIONS

103.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that directly purchased glyburide tablets from one or more of Defendants in the United States and its territories and possessions at any time during the period from April 1, 2014, through the present (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.

104.    Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are dozens of Class Members, geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable. Further, the Class is readily identifiable from information and records maintained by Defendants.

105.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class Members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

- 29 -

106.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

107.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

108.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed class arose from the same collusive conduct alleged herein.

109.    The common legal and factual questions do not vary among class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

(a)    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby stabilize prices, rig bids, and allocate markets for glyburide in the United States;

(b)    The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;

(c)    Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)    The effect of the contract, combination, or conspiracy on the prices of glyburide tablets in the United States during the Class Period;

(e)    Whether Defendants' conduct caused supracompetitive prices for glyburide tablets;

- 30 -

(f)     Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g)     Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

110.    Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

111.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   ANTITRUST INJURY

112.    During the Class Period, Plaintiffs and Class Members directly purchased glyburide tablets from Defendants.  Because of the Defendants' anticompetitive conduct, Plaintiffs and Class Members were forced to pay more for glyburide tablets than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

113.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiffs and Class Members have sustained, and continue to sustain, significant losses in the form of artificially supracompetitive prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

- 31 -

114.    Defendants, through their unlawful conduct alleged herein, reduced competition in the glyburide market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

115.    Because Defendants' anticompetitive conduct is ongoing, Plaintiffs and the Class continue to pay supracompetitive prices for glyburide through the present.

## IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT

116.    Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

117.    In violation of Section 1 of the Sherman Antitrust Act, Defendants entered agreements with one another concerning the pricing of glyburide in the United States.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

118.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts were intentional, were directed at the sales of glyburide tablets in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing glyburide prices throughout the United States.

119.    The conspiracy had its intended effect, because Defendants have benefited—and continue to benefit—from their collusion and the elimination of competition, both of which artificially fixed the prices of glyburide.

120.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

> a.    Prices charged to, and paid by, Plaintiffs for glyburide were artificially raised, fixed, maintained, or stabilized at supracompetitive levels;

    b.      Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of glyburide in the United States market; and

    c.      Competition in establishing the prices paid for glyburide was unlawfully restrained, suppressed, or eliminated.

121.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they have paid more for glyburide than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial, but is believed to be in the hundreds of millions of dollars classwide.

122.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

123.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

124.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief from this Court and request:

A.    Certification as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.     A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.     An award to Plaintiffs and Class Members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of this Complaint;

E.     An award to Plaintiffs and Class Members of the costs of this suit, including reasonable attorney fees; and

F.     An award of any further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby request a jury trial on all claims so triable.

Dated May 9, 2017

Respectfully submitted,

NASTLAW LLC

By _____
        Dianne M. Nast

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, PA 19107
215-923-9300
215-923-9302 (facsimile)
dnast@nastlaw.com
eburns@nastlaw.com

*Interim Co-Lead Counsel in MDL 2724*

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
Lauren Guth Barnes
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
617-482-3700
617-482-3003 (fax)
tom@hbsslaw.com
davidn@hbsslaw.com
lauren@hbsslaw.com

*Member of Plaintiffs' Steering Committee in MDL 2724*

HAGENS BERMAN SOBOL SHAPIRO LLP
Barbara A. Mahoney
Jerrod C. Patterson
1918 Eighth Ave., Ste. 3300
Seattle, WA 98101
(206) 623-7292
(206) 623-0594 (fax)
barbaram@hbsslaw.com
jerrodp@hbsslaw.com

VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek
David P. Germaine
55 W. Monroe

BERGER & MONTAGUE, P.C.
David F. Sorensen
Zachary D. Caplan
Christina M. Black
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
zcaplan@bm.net
cblack@bm.net

*Member of Plaintiffs' Steering Committee in MDL 2724*

FARUQI & FARUQI, LLP
Peter Kohn
Joseph T. Lukens
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

TAUS, CEBULASH & LANDAU, LLP
Barry S. Taus
Kevin Landau
Archana Tamoshunas

- 35 -

Chicago, IL 60603
(312) 224-1500
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

RADICE LAW FIRM
John D. Radice
April D. Lambert
A. Luke Smith
34 Sunset Blvd
Long Beach, NJ  08008
(646) 245-8502
(609) 385-0745 (fax)
jradice@radicelawfirm.com

COHEN MILSTEIN SELLERS
& TOLL PLLC
Sharon K. Robertson
Donna M. Evans
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838 7797
(212) 838 7745
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Counsel for FWK Holdings, L.L.C. and the
Proposed Direct Purchaser Class*

New York, NY 10038
(212) 931-0704
btaus@tcllaw.com
klandau@tcllaw.com
atamoshunas@tcllaw.com

*Counsel for Rochester Drug Co-Operative,
Inc. and the Proposed Direct Purchaser
Class*